UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

Stephen Owen Wysong,

    Plaintiff,

    v.

Carolyn W. Colvin,
Acting Commissioner of
Social Security,

    Defendant.

Case No. 3:13-CV-43-JVB-CAN

**OPINION AND ORDER**

    Plaintiff Stephen Owen Wysong seeks judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, who denied his application for Disability Insurance Benefits under the Social Security Act. For the following reasons, the Court affirms.

**A. Procedural Background**

    In February 2010, Plaintiff applied for Disability Insurance Benefits alleging disability due to diabetes mellitus with retinopathy, prostate cancer, depression, and anxiety, with an onset date of November 4, 2009. (R. at 133–34.) His claim was denied initially and upon reconsideration. (R. at 70–73, 75–77.) He requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 78–79.) The hearing was held before Romona Scales on September 13, 2011, in Valparaiso, Indiana. (R. at 37.) On October 13, 2011, the ALJ determined that Plaintiff was not disabled. (R. at 6-22.) Following the Appeals Council's denial of Plaintiff's request for review, the ALJ's opinion became final. (R. at 1–5.)

**B. Factual Background**

**(1)** *Plaintiff's Background and Testimony*

Plaintiff was born in 1951. (R. at 40.) He lives in South Bend, Indiana with his wife of thirty-eight years. (R. at 57.) After completing high school, he finished one year of college. (R. at 41.) For fourteen years, he worked as a furniture salesman, and in that capacity, he often carried items weighing around 150 pounds, with and without assistance. (R. at 42–43.) Plaintiff identified that he often experienced anxiety and depression at work, which only worsened after doctors diagnosed him with prostate cancer. (R. at 44–45.) In November and December 2009, he underwent radiation treatment, which further accentuated his anxiety and depression. (R. at 45.) In March 2010, after experiencing suicidal thoughts he began psychological treatment at Madison Center, a psychiatric hospital located in South Bend, Indiana. (*Id.*) At the hearing, Plaintiff testified that his prostate cancer was not currently in remission, but rather his PSA numbers were increasing, potentially indicative of his need to undergo further hormone therapy. (R. at 56.)

Plaintiff's daily routine involves: waking up around 9:00 a.m., eating cereal, feeling anxious, which causes him to return to bed for a few hours, waking up and watching television, falling asleep, waking up for dinner, returning to television, and then retiring to bed for the evening. (R. at 48, 55.) On average, Plaintiff sleeps about fifteen hours a day. (R. at 50.) Due to his fatigue, he described being able to help with some activities around the house—such as dishes or driving to the store for his prescriptions or a gallon of milk—but he contended he cannot complete any outside chores. (R. at 52.) Further, he explained he has difficulty focusing and remembering. (R. at 50.) A few hours after watching television, he is able to recall parts

("maybe two thirds") of what happened during the show, but the next day he hardly remembers anything about the program. (R. at 51.)

Concerning his physical capabilities, Plaintiff testified that occasionally he could lift about twenty pounds. (R. at 45.) He expressed no issues with sitting for extended periods of time but claimed he could only stand comfortably for about fifteen minutes due to his fatigue. (R. at 46.) He does not regularly walk but could likely walk around the block. (*Id.*) Plaintiff has no problem using his hands or reaching his arms out in front of him; however, his balance causes him to struggle when reaching overhead. (R. at 48–49.)

He also suffers from severe vision problems. (R. at 49.) As of the hearing date, Plaintiff had undergone six laser surgeries—the most recent surgery took place one-and-one-half years earlier—and on two prior occasions, doctors had removed fluid from his right eye. (*Id.*) He expressed concern with his eyesight if he returned to work as a salesman because his vision would make it difficult to input inventory numbers into a computer. (R. at 50.)

Further, Plaintiff has suffered from diabetes for thirty-four years but testified that "for the most part" it was under control. (R. at 47–48.) He described that a few times a week his blood sugars are too high or too low. (R. at 47.) As an illustration, he explained that he checks his blood sugar roughly seven to eight times a day, and about two or three of those times his blood sugar is low. (*Id.*)

Plaintiff also struggles to deal with groups of people for longer than ten minutes, and as a result experiences anxiety, causing him to breathe heavier and have lapses in memory. (R. at 52–53.) Plaintiff described that he has a difficult time when his grandkids visit because the social environment becomes too stressful. (R. at 176.) At the hearing, he explained that he felt as though he was "getting boxed in" and stated that he wanted "to get out of [t]here." (R. at 53.)

**(2)** *Testimony of Plaintiff's Wife*

Plaintiff's wife, Deborah Wysong, also testified at the hearing. (R. at 57–63.) Ms. Wysong explained that, before his treatment for prostate cancer, he was an outgoing salesman but that the radiation appeared to make him depressed and inactive. (R. at 57.) As a result, he sought treatment from Madison Center, which helped to make it so he was not feeling suicidal. (R. at 58.) However, ever since his prostate cancer, she testified that he "sleeps a lot" and contended that his fatigue, depression, and daily radiation treatments caused him to stop work. (R. at 61–62.) They used to go out to dinner or meet with friends often, but according to Ms. Wysong, Plaintiff now acts more isolated. (R. at 59.)

Ms. Wysong further confirmed Plaintiff's difficulty in remembering. (*Id.*) For example, he would not recall what he watched on television, or if she simply asked him to complete a number of tasks he would forget. (R. at 60–61.) However, if she wrote down a list of things for him to do, then he would remember and complete the chores. (R. at 60.) Ms. Wysong further claimed that his memory initially contributed to his struggle in taking his medication. (*Id.*)

**(2)** *Medical Evidence*

Plaintiff claimed that his severe, medically determinable impairments include: diabetes, diabetic retinopathy, prostate cancer, depression, and anxiety. (R. 133–34, 155.)

Concerning his diabetes, at the request of Dr. Stanish—Plaintiff's primary-care physician—he visited Dr. Gardine, an endocrinologist, who in September and December 2008 noted Plaintiff had nephropathy and retinopathy. (R. at 266, 277.) Dr. Gardine explained that Plaintiff struggled to control his blood sugars, as he described Plaintiff as "correcting lows frequently, and then chasing highs." (R. at 266.) However subsequent visits seemed to illustrate

marked improvement in Plaintiff's control of his diabetes and showed he was without retinopathy or nephropathy. (R. at 250, 257.) On August 24, 2010, Dr. Gardine noted that his diabetes was improving. (R. at 426.)

Plaintiff also saw an ophthalmologist, Dr. Thomas Hauch, regarding his diabetic retinopathy. (R. at 221.) In February 2008, he had developed proliferative diabetic retinopathy with bleeding in the right eye. (*Id.*) As a result, on multiple occasions, Dr. Hauch photocoagulated his eye and on one occasion vitrectomized it after it failed to show signs of improvement. (R. at 221, 224, 227.) At subsequent appointments, from October 2008 to July 2009, Dr. Hauch reported that Plaintiff's right eye was "stable." (R. at 233–37.) However, in August 2009, Dr. Hauch photocoagulated Plaintiff's left eye after his examination revealed a vitreous hemorrhage. (R. at 238.) His proliferative disease was stable in his right eye, as of January 2010, but he had developed a cataract. (R. at 242.) In June 2010, Plaintiff experienced bleeding in his left eye, which Dr. Hauch addressed with further photocoagulation, and later that month, Plaintiff underwent cataract surgery on his right eye, performed by Dr. Richard Weiss. (R. at 382–83, 399.) In August 2010, Dr. Hauch saw Plaintiff post-cataract surgery and noted that his left eye showed improvement but his right eye was borderline concerning the amount of retained lens that could be tolerated. (R. at 401.)

Plaintiff met with Dr. Walker, on August 24, 2009, as a follow-up for his previous prostate cancer. (R. at 246.) Dr. Walker noticed that Plaintiff appeared to be doing well but that his PSA levels were rising. (*Id.*) At a subsequent appointment, in February 2009, Dr. Walker identified that Plaintiff's PSA levels showed an increase over the past few years but that "it has not been highly suspicious for recurrent prostate cancer." (R. at 247.)

Plaintiff also contends that he suffers from severe depression and anxiety. In December 2009, Plaintiff visited Dr. Stanish concerning his depression. (R. at 321.) Dr. Stanish described Plaintiff as "experiencing anxious, fearful thoughts, irritable mood, fatigue or loss of energy and panic attacks." (*Id.*) Dr. Stanish advised of various medications and also proposed the possibility of employing a psychiatrist for further help. (R. at 322.)

On February 24, 2010, Plaintiff visited Madison Center for a psychological evaluation, after referral from Dr. Stanish and Plaintiff's oncologist. (R. at 353.) The psychiatric evaluation revealed that weakness was major issue of Plaintiff's depression, as he would spend twelve to fourteen hours in bed. (*Id.*) Further, the evaluation revealed that Plaintiff had developed anxiety and depression that was secondary to the post radiation therapy concerning his prostate cancer. (R. at 355.)

In May 2010, Plaintiff informed Dr. Stanish that he did not want to return to Madison Center, as his insurance would not cover it. (R. at 410.) Plaintiff explained that he finished radiation six months earlier, but he was feeling weak and fatigued since radiation, which prevented him from working. (*Id.*) Further, in July 2010, he expressed that he became fatigued during activity; however, while he contended that he had more difficulty with strength, he did not exhibit any weakness during the physical examination. (R. at 406, 408.) Plaintiff also complained of difficulty with memory and concentration since beginning radiation. (R. at 406.) In September 2010, Dr. Stanish noted that Plaintiff's diabetes, depression, and hyperlipidemia were stable and that Plaintiff did not have fatigue. (R. at 458–59.) Additionally, on August, 8, 2011, Dr. Stanish recorded that Plaintiff was not suffering from fatigue. (R. at 464.)

As the primary care physician, Dr. Stanish authored a letter on March 4, 2011, outlining his assessment of Plaintiff. (R. at 453–54.) In his opinion, Dr. Stanish explained that during

6

Plaintiff's radiation therapy he experienced "extreme fatigue." (R. at 453.) According to Dr. Stanish, the fatigue was so significant that Plaintiff quit his job because of his inability to stay awake. (*Id.*) He described Plaintiff as "recalcitrant to any oral medications" and noted that Madison Center diagnosed that he "had very severe depression." (*Id.*) Dr. Stanish recognized that Plaintiff was unable to continue work due to the severity of his depression, but contended:

It is difficult for me to tell if this has been caused by the radiation therapy, but it did seem to happen time wise. . . . Currently his diabetes is under control and it is not a limiting factor. His retinopathy is an issue as far as vision is concerned, but I do not have the details to tell the severity of this at this time.

(R. at 454.)

Additionally, in May 2010, Plaintiff met with Dr. Mahmoud Yassin-Kassab for an examination concerning his disability claim. (R. at 376–77.) Dr. Yassin-Kassab recorded that Plaintiff was "able to grasp, lift, carry, manipulate objects in both hands and perform repeated movements with both feet." (R. at 377.) Further, he could "bend over without restriction and squat normally" and also "sit, stand and walk normally." (*Id.*)

Dr. Amy Johnson, a state agency psychological consultant, also examined Plaintiff, on April 1, 2010. (R. at 358–61.) Dr. Johnson recognized that he was moderately limited in his ability to understand and remember detailed instructions. (R. at 358.) Further, he had moderate limitations in carrying out detailed instructions, maintaining attention or concentration for extended periods, completing a normal workday or workweek without psychological difficulty, interacting with the public, and responding to changes in the work setting. (R. at 358–59.) Thus, Dr. Johnson reasoned that Plaintiff suffered from an anxiety disorder and mood disorder but found that it did not precisely satisfy the diagnostic criteria. (R. at 358–61.)

Subsequently, Plaintiff met with Dr. Goldstein concerning his psychological concerns on January 2, 2011. (R. at 467–68.) Dr. Goldstein recognized that Plaintiff suffered from increased

anxiety, issues with depression, and was unable to work because he could not face people. (R. at 468.) Dr. Goldstein recommended increasing Plaintiff's medication. (R. at 468.) At a follow-up examination in March 2011, Plaintiff stated that he would often forget to take his medication after the morning dosage and would refuse to take some medication because he believed that it made him more anxious. (R. at 469.) Dr. Goldstein reported that Plaintiff "clearly is resistant to taking medication." (R. at 469.) Further, at a follow up examination in June 2011, Dr. Goldstein noted that Plaintiff "does not take the medications consistently." (R. at 471.)

**(3)** *Vocational Expert's Testimony*

Vocational expert Dr. James Lozer ("VE") testified at Plaintiff's September 13, 2011, hearing before the ALJ. (R. at 62–67.) During the VE's testimony, the ALJ provided him with three hypotheticals to evaluate, all of which included Plaintiff's age, education, and prior work experience. (R. at 63–67.) For the first scenario, the ALJ instructed the VE to assume the individual could "understand, remember, and carry out simply instructions," could engage in "work that involves brief, superficial contact with the general public, but could otherwise interact with co-workers and supervisors appropriately," and could "sustain attention and concentration to carry out simply, routine, repetitive work, [while] tolerat[ing] the stresses associated with such." (R. at 64.) The VE concluded that, under this factual scenario, Plaintiff could not perform his past relevant work. (*Id.*) However, he could complete medium unskilled work. (*Id.*) Examples of positions included assemblers (18,000 existing jobs in Indiana), custodians (25,000 existing jobs in Indiana), and dishwashers (7,000 existing jobs in Indiana). (R. at 64–65.)

For the second hypothetical, the ALJ asked the VE to assume the previous limitations along with limiting the person to "occasional climbing, occasional crouching, crawling, and kneeling, frequent balance and stop, occasional overhead reach bilaterally, [and] occasional

8

exposure to hazards." (R. at 65.) The VE concluded that Plaintiff could perform the previously identified jobs with these additional limitations. (*Id.*)

Under the third factual scenario, the ALJ proposed a hypothetical involving all the previous limitations but under the light exertion level, as outlined in the regulations. (*Id.*) The VE concluded that these circumstances would preclude all semi-skilled or skilled work. (R. at 66.) The ALJ followed up by inquiring as to how those scenarios would be impacted if a person, due to psychological factors, was off task 15% to 20% of the time, missed a day of work, or laid down for at least one hour during the work day. (*Id.*) The VE opined that such absence would eliminate full time competitive work. (*Id.*)

**(4)** *ALJ's Decision*

On October 13, 2011, the ALJ issued a decision that Plaintiff was not disabled from November 4, 2009, through the date of the decision. (R. at 18.) The ALJ determined that Plaintiff suffered from multiple severe impairments: diabetes mellitus with retinopathy, status post-prostate cancer, depression and anxiety. (R. at 11.) Nevertheless, the ALJ concluded that these impairments did not meet any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12.)

Further, the ALJ found that the Plaintiff had not engaged in any substantial gainful activity since the alleged onset date (R. at 11), and was unable to perform any past relevant work. (R. at 16.) However, the ALJ concluded that in considering Plaintiff's age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers that Plaintiff could perform. (R. at 17.)

**C. Standard of Review for Disability Insurance Benefits Claim**

Under 42 U.S.C. § 405(g), this Court has the authority to review Social Security Act claim decisions. 40 U.S.C. § 405(g) (2006). The Court will uphold an ALJ's decision if it is reached under the correct legal standard and supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court will not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). However, this Court will assess whether the ALJ built an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may access the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

**D. Disability Standard**

To qualify for Disability Insurance Benefits, a claimant must prove that he suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set forth a five-step test used to assess whether a claimant qualifies for disability benefits. Pursuant to these regulations, a claimant must establish:

(1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**E. Analysis**

Plaintiff contends that the Commissioner's decision is not based on substantial evidence as required under 42 U.S.C. § 405(g). Plaintiff asserts that the ALJ committed two legal errors: (1) the ALJ failed to give adequate weight to Plaintiff's primary physician; and (2) the ALJ erred in failing to properly analyze Plaintiff's subjective complaints of chronic fatigue because the ALJ's assessment of Plaintiff's credibility was conclusory.

**(1)** *The ALJ's decision considering the weight to afford Dr. Stanish's medical opinion was supported by substantial evidence.*

An ALJ must afford a treating doctor's opinion controlling weight if it is well supported and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see also* 20 C.F.R. § 404.1527(c)(2).

Plaintiff claims the ALJ erred in her assessment of Plaintiff's Residual Functional Capacity ("RFC") assessment because she failed to give controlling weight to treating physician

11

Dr. Stanish. However, the ALJ provided sufficient reasons as to why Dr. Stanish's opinion was inconsistent with other evidence in the record and outside his area of expertise, and thus not entitled to controlling weight. (R. at 15–16.)

The ALJ opined that Dr. Stanish's medical source opinion deserved little weight because the opinion was inconsistent with other psychological records. (R. at 16.) The Court agrees. Dr. Stanish contended that Plaintiff was "unable to work because of the severity of his depression," noting that it "has not improved despite all of the medications that [he] ha[s] tried." (R. at 454.) Although Plaintiff undoubtedly has received various medications, Dr. Stanish himself recognized Plaintiff was "recalcitrant to any oral medications." (R. at 453.) Further, Dr. Goldstein's psychiatric records from March 2011, support that Plaintiff "clearly is resistant to taking medications." (R. at 469.) Plaintiff admitted at the examination with Dr. Goldstein that he often forgets to take his medication after the morning dosage. (*Id.*) A follow-up examination, in June 2011, further supports Plaintiff's failure to take his prescribed medication. (R. at 471.) Dr. Goldstein recorded that he "does not take the medications consistently." (*Id.*) For instance, although Plaintiff recognized the medication was helping his condition, he acknowledged that he failed to consistently take such medication. (*Id.*)

Plaintiff also takes issue with the determination because the ALJ claimed Dr. Stanish was "not a mental health professional and therefore [was] not qualified to give an opinion regarding disability regarding mental impairments." (R. at 16.) Thus, the ALJ gave Dr. Stanish's opinion concerning mental impairments little weight and instead allocated controlling weight to the opinion of state agency psychological consultant, Dr. Johnson. (*Id.*) The Court finds that the ALJ provided a sufficient basis for her allocation of weight. The ALJ recognized that Dr. Johnson's opinion was consistent with the objective evidence of record, including Dr. Goldstein's

psychiatric evaluations and Madison Center's assessment. (R. at 351–57, 467–72.) Consistent with the Madison Center evaluation, Dr. Johnson opined that Plaintiff suffered from a mood and anxiety disorder. (R. at 355, 360, 365, 367.) Nevertheless Dr. Johnson found that Plaintiff's mood and anxiety disorders did not precisely satisfy the diagnostic criteria required. (R. at 365, 367.) Dr. Johnson's opinion is also consistent with the assessment conducted by Dr. Goldstein in 2011. (R. at 467–72.) Dr. Goldstein's assessments revealed Plaintiff suffers from an adjustment disorder with depression and anxiety, and an anxiety disorder. (R. at 468.) Further, on two follow-up examinations, in March 2011 and June 2011, Dr. Goldstein diagnosed Plaintiff with a major depressive disorder with moderate recurrence and a generalized anxiety disorder. (R. at 469, 471.) These consistencies, coupled with Dr. Stanish's previous observations regarding Plaintiff's discipline in taking his medications, support that the ALJ provided a sufficient basis for affording Dr. Johnson's opinion, an opinion of a mental health professional, controlling weight.

Further, although Dr. Goldstein's opinion is in some regards consistent with Dr. Stanish's opinion concerning the depression, this alone does not signal that Plaintiff's condition satisfies the diagnostic criteria under 12.04. Thus, the ALJ's decision to allocate little weight to Dr. Stanish's opinion, relating to Plaintiff's mental health issues, is supported by substantial evidence.

The Court also finds that the ALJ did not completely discredit Dr. Stanish's findings because the ALJ made accommodations to Plaintiffs RFC after reviewing Dr. Stanish's assessment of Plaintiff's fatigue. Plaintiff contends that the ALJ did not appropriately consider the other evidence offered by Dr. Stanish in his medical opinion. In pertinent part, Plaintiff argues that "there is ample evidence to support Dr. Mark

13

Stanish's opinion that [Plaintiff]'s severe fatigue, memory difficulties and inability to focus are so severe he would be unable to support full time competitive employment." (Pl.'s Opening Br. 13.) However, the ALJ once again recognized that Dr. Stanish's opinion was inconsistent with his own assessment of Plaintiff. (R. at 15.) In July 2010, Plaintiff claimed he experienced fatigue, but Dr. Stanish upon examination found no physical weakness. (R. at 406, 408.) Additionally, in September 2010, Dr. Stanish recorded Plaintiff was negative for fatigue, and similarly, in August 2011, noted Plaintiff exhibited no symptoms of fatigue. (R. at 459, 464.) Yet, even though Dr. Stanish's records were inconsistent with his opinion, the ALJ subsequently noted that it accommodated Plaintiff's complaints of fatigue and lack of energy, as recognized by Dr. Stanish, by limiting Plaintiff to the medium physical demand, restricting his postural activities, overhead reaching, and exposure to hazards. (R. at 15.)

The Court finds the ALJ's assessment of the amount of weight afforded to Dr. Stanish's opinion is sufficient considering his area of expertise and other evidence in the record. Thus, the Court concludes that the ALJ's assessment of weight afforded to the treating physician's opinion is supported by substantial evidence.

**(2)** ***The ALJ sufficiently considered Plaintiff's subjective complaints concerning his chronic fatigue and its impact on his ability to work.***

Last, Plaintiff asserts that the ALJ legally erred by improperly dismissing Plaintiff's testimony concerning his chronic fatigue. Because the Court finds that the ALJ adequately accommodated Plaintiff's subjective complaints of fatigue, the Court affirms the ALJ's findings.

The Seventh Circuit has recognized that "[b]ecause the ALJ is in the best position to observe witnesses, we will not disturb h[is] credibility determinations as long as they find some

14

support in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1178–79 (7th Cir. 2001). The Court will reverse an ALJ's credibility determination only if Plaintiff establishes it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Patently wrong" is a high burden. *Turner v. Astrue*, 390 Fed. App'x. 581, 587 (7th Cir. 2010). "An ALJ's credibility determination need not be flawless." *Adams v. Astrue*, 880 F. Supp. 2d 895, 905 (N.D. Ill. 2012) (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2008)). Only when an ALJ's determination lacks any support or explanation will the Court declare it "patently wrong," so as to require reversal. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (citations omitted). Thus, only if the ALJ grounds his credibility determination in an unreasonable argument or observation will the credibility finding be reversed. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

The issue is whether the ALJ supported this credibility determination with an explanation and sufficient evidence from the record, and the Court finds that she provided sufficient evidence as to why the Plaintiff's testimony regarding the extent of his fatigue was not credible. Most convincingly, the ALJ recognized various discrepancies between Plaintiff's subjective complaints and the medical evaluations conducted. For instance, although Plaintiff testified that his PSA levels were increasing and claimed that his prostate cancer was not currently in remission, Plaintiff failed to provide any records indicating the recurrence of his prostate cancer. (R. at 56.) Further, the previous records of Dr. Walker provided contrary evidence regarding the rise in PSA levels. (R. at 247.) Dr. Walker noted that over the years Plaintiff's PSA levels were unstable and often times had increased, but he nevertheless contended this was not "highly suspicious for recurrent prostate cancer" (R. at 247.)

Additionally, although Plaintiff complained of "fatigue and decreased energy due to the radiation therapy," the ALJ recognized that Dr. Stanish noted Plaintiff demonstrated no

15

weakness upon physical examination when he was in remission. (R. at 408.) Further, subsequent evaluations performed by Dr. Stanish—for instance, in September 2010 or August 2011—revealed that Plaintiff did not exhibit symptoms of fatigue. (R. at 458–59, 464.) As a result of this inconsistency, the ALJ, in assessing Plaintiff's subjective complaints, chose to limit him to the medium physical demand and further restricted his postural activities, overhead reaching, and exposure to hazards, consistent with additional subjective complaints. (R. at 15.) Thus, although the ALJ did not necessarily believe the extent of Plaintiff's subjective complaints, she still made accommodations to Plaintiff's RFC to reflect the extent of his alleged fatigue.

Each of the above-mentioned reasons supports the ALJ's finding concerning Plaintiff's credibility as it relates to the extent of Plaintiff's fatigue. Thus, the Court finds the ALJ's decision concerning Plaintiff's subjective complaints of fatigue is supported by substantial evidence.

**F. Conclusion**

The Court finds that the ALJ gave appropriate weight to Plaintiff's primary physician, and the ALJ also did not err in her determination of Plaintiff's subjective complaints concerning his fatigue.

The Court affirms.

SO ORDERED on March 27, 2014.

                                               S/ Joseph S. Van Bokkelen
                                               JOSEPH S. VAN BOKKELEN
                                               UNITED STATES DISTRICT JUDGE